with the respondent again. Good morning, sir. Good morning, Your Honors. Bill Wheelock of Feinbogs & Perkins on behalf of Tracy Toyota, which is petitioner and respondent in this case. I'd like to reserve four minutes for rebuttal. This case has three overarching issues, one of which is unfair labor practices related to the alleged failure to reinstate employees off the late-law list following the strike and the unconditional offer to return to work. The second relates to the issue of whether the two foremen or 211 supervisors, and that deals with both election issues as well as a ULP issue. And then the third issue relates to the Thrive issue on the remedies which the court discussed with respect to the last matter. Is that issue waived here, though? I don't believe so, Your Honor. It was, you know, this was something that has been argued, and I believe in the brief we addressed that by, you know, I know the argument was made that by not seeking reconsideration at issue when those remedies were issued, that the issue was waived. In our reply brief, we did address that as far as that this was a new issue, that the, certainly the amount of the purported, you know, the damages under Thrive have not been set, so potentially it's maybe not even a ripe issue as has been discussed before since that goes through the follow-up issues upon enforcement of it as opposed to the actual ULP issue. But it's also an issue that has been fully briefed to the court and raises constitutional issues as far as whether these types of damages are even . . . None of that now are way afield of what was presented to the NLRB, right? I mean, they were never, you never argued to the NLRB about, you know, constitutional jury trial, right, other types of issues like that. No, that was not part of the briefing. But also, you have both a statutory and a constitutional issue, right? It's a statutory and a constitutional issue. And the statutory issue was never raised to the board either. It was not. With respect to the failure to reinstate it off the Wade Law list, you know, the evidence was pretty working at the time that the employees went on strike. There were 16 employees, three of which were on a leave of absence, plus an additional employee who had been hired just before the strike had occurred. Yeah. Well, is the case law, for purposes of the employee complement, is the question who was hired or who was working? It was, I believe it was who was hired at the time that went on strike. Because that's board case law? Is that why? I believe the case law supports that. The, you know, but that's the issue in this case, is whether the other two employees that the board determined were . . . Well, I understand that, but I was asking a predecessor question. It's not entirely logical. I mean, sometimes you hire people for a year out and for a long time. Law clerks are hired two years out and three years out. They're hired, but they're not working for many years. I understand. And the one employee who was hired, you know, with one employee who was hired and not yet actively working, we don't disagree because he was supposed to start working pretty quickly thereafter. And so we, you know, there really wasn't an issue from the employer's aspect that . . . James? Lopez and Spider, yes. Spider, was whether they actually had accepted offers to work, not whether they were actually on the job. Whether they were actually employed by the, yeah, whether they had been hired at that point by the company. Okay. And I believe that the evidence shows that they weren't. You know, their behavior . . . Well, with Francisco Lopez, he test, he specifically testified that he was and that he, I understand you say it was in response to a leading question, but he then later says, but I have it in my, in my calendar. So there was evidence. Why isn't that substantial evidence? But I think that the, the documentary evidence, which was discounted by the ALJ, indicate, shows that . . . Well, okay, but that's just ordinary fact-finding. I mean, you have one person who says he was hired and he has a record of it and no, and, and these pieces of paper, you know, can easily be explained as, you know, after the fact manifestations of something that had already been decided, an offer that had been made and accepted. I understand. And with respect to the substantial evidence, that was some evidence, that was some evidence on a leading question, yes, that, that potentially he had been offered the job prior to . . . Views here on whether Mr. Lopez was hired, was there any evidence that your client put forward that you believe the board didn't sufficiently address or consider? I think, I think the documentary evidence with respect to when he actually completed his new hire paperwork, because I believe with the other employee, the new hire paperwork had been done prior to the strike having been gone on. So there was no question that he had been hired at that point. Right, but they, they acknowledge this documentary evidence. It's not as though they ignored it. They considered it and they, they seem to believe that Lopez's testimony and his recollection of the calendar entry was more persuasive. And as far as evidence that was not considered, you know, I, I believe the evidence is all there. I think they gave short shrift to, to the evidence, to, to the documentary evidence and the . . . Well, meaning they, they, they, they preferred the other evidence, but they didn't ignore it. They didn't say that what, they didn't, they recognized there was such evidence. Well, I think, I think the evidence that the ALJ pointed to with respect to the documentary evidence was related to a question that the ALJ had regarding to what, regarding whether the dates on the documents were print dates or actual dates. And I don't believe that, and that's addressed in our brief, and I don't believe that was supported, that her conclusion that the dates on the documents could have been incorrect were somehow, that they were somehow incorrect. I don't believe that the evidence supports that conclusion. What is the, if this order is enforced as to the reinstatement of the two workers, what is the consequence of that for your client? Well, the consequence of it at this point is, is back pay, potentially back pay, potentially other damages under the Thrive decision. What those are, we don't, we don't have. Who would be entitled to back pay for this? Because it's almost, the theory is essentially that you would have had to hire two more people, so who, who would be getting the back pay? It, it would have been the specific individuals. I don't know that I can, I can name them off the top of my head, but they would have been two additional employees off of the laid law list. How, how do they pick which of the two employees, because there's more than two on the laid law list, but if there's two spots, how do they pick which ones get back pay? The mechanics of the laid law list, I believe that they just have to, I think it's based on seniority is the way that they were, that they were doing it, and based on the position. So if it was somebody who was a, you know, if it was a There would be two employees, I guess it's a Yeah. So, you know, one of the, the struggle you've got here is the substantial evidence, and, and so they get, we, we give deference to the agency's conclusion. And so that, that's an uphill battle for you. What I'm trying to figure out, the dissenting NLRB member agreed with you on this issue, and his position was, if I recall correctly, that, that the board had not met its burden. So he replied, he relied significantly on the board's, that the board has the burden here, because there's, and so what do, do you have any thoughts on what we do with, there's, in one sense, the board has a burden, the burden to show that, that there was eight, 19 instead of 17 spots, but on the other hand, and that works in your favor, I suppose, but the other, you know, so how do, what do we do with the board having the burden combined with the substantial evidence? How do those two things interplay here? Well, I think with the, with the substantial evidence and the board having the burden, I think the other element to this that we haven't discussed is, were the physical limitations of the shop that we're working at. And this was, this was, it was clear that, that there were 14 mechanics stalls for line technicians, people who did, you know, technicians who did do all the repair work on the cars. There were also three other positions, you know, and the way that you get from 14 stalls to having 17 employees is you have three lube decks who have a cart that they can find space to be able to work on the car when they're doing lube and oil, you know, lube and oil changes, basically. The evidence is clear that of these 14 stalls, all 14 of them were assigned to line technicians and that the stalls were not available to other technicians when one of the assigned technicians was either absent because it was his day off or because he was on a leave of absence. You know, the stalls have their, their gigantic toolboxes, which are personal property for the technicians that are not shared among other people. Oftentimes they'll leave vehicles in the stalls when they're off overnight. There's, there's just not, there just was no evidence that an additional technician could have been accommodated anywhere in the shop with respect to, you know, if you were to hire another line technician, include these other two technicians that, that the board is saying should have been added off the lay-dwell list. There just wasn't simply physical space for them to work in the shop. There was no stalls to be assigned to them. Is the implication of this is that there were more stalls than, or more people, more employees than stalls prior to the strike? No, there, there were exactly the amount of employees and stalls. I thought there were more, but some were off. There were, there were 14 employees who were employed, who were line technicians, and there were 14 stalls. Each of them had, had, each of them were assigned a stall. There were two or three who were on a leave of absence, a medical leave of absence that was protected. They didn't move their stuff out of the stalls. They were expected to come back shortly. So those stalls could not be reassigned. But if an employee was not using his stall because he was out that day, could somebody else use it? No. And it's because either they could have had a vehicle, but also because they had their tool, their toolboxes. Is this all in the record? I thought that the board's position, and we'll ask them, was that this material was not explicated in the record. The toolboxes and the assignment of stalls was certainly referred to in the record. And I could, you know, I could provide that to the court. And was the argument made to the ALJ and the board that this was relevant? Yes. And then the other three people who we're talking about were employees at the time, were the three lube technicians, which were, which have, which basically do oil changes, and they have a cart that they can go around to different places in the dealership if there's, you know, if there's space available. They don't have to have a stall. They can, they can actually perform that work elsewhere. And so, if, you know, with the board determining that two additional technicians had to be, you know, had to have been recalled off the late oil list, the only way that that could have happened was, was to have additional space in the shop that just wasn't there. There was another, there's a lube, there is a quick lube shop that was, had not been open prior and was not in a condition, and this was in the evidence as well, was not in a condition to be able to be reconditioned at the time that the strike ended to, to accommodate additional technicians at that point. So, there just was no physical space in the shop to add two additional line technicians, which would have been what would have been recalled off the late oil list. So, from, from those, that standpoint, I believe that the... What is your response to, as I recall, the, the board's response was that your own productivity report showed that you had more than 14 before, you know, in January and April. So, they're, they're just saying that that's, that's an argument you're making, but it can't be limited to 14 because you had more than 14. Well, if you look at, I mean, the productivity, you have to look at the number of employees. The productivity is based upon, upon the, the book hour, you know, the hours, what they call the flag hours versus the hours worked, and if they work more flag hours, which means the hour, the way the technicians typically work is the number of hours that they work are... Okay, just let me see if I, their point is, your point, as I understood it, was they can't share. In theory, you could get more than 14, even though you have 14 stalls because people share a stall, but they can't because they aren't going to share their tools, etc. But the board, as I understood it, said, no, you had somewhere between 15 and 18, and according to these productivity reports, so your point that they can't share a stall, you were, you had more than 14. So, that's what their point is. They're saying you had more than 14. We know you, here's some evidence that they had more than 14. So, their argument that you're just limited, hard limit to 14 is, is not correct. What is your response to that? I don't know that I have a response to that off the top of my head, Your Honor. The dealership did do its best to put in as many people as it had hired, as it had working on the day that, on the day that the strike happened. And so, from that standpoint, it fulfilled its obligation under late law. You know, whether they had, were in discussions to hire other people before that, you know, I think, you know, there's the evidence that they, that that hiring occurred after. What is the, what record evidence do you have that the stalls were only for one person who essentially owned that stall and nobody else would work there? Because that's kind of the argument you're making. What is in the record on that? I believe there's testimony from a couple of different, of the technicians, as well as the general manager, the manager of the, the service manager who testified with respect to the, with respect to the operations. You got to Spire for a moment. One of the things that the Board relies on is statements made by the company's counsel that Spire offered and accepted a job as a nonsupervisory foreman before the strike, and then that would give him a, afterwards they gave him a permanent replacement position as a supervising foreman. Does that make sense? He was hired in a different position. He wasn't hired as a permanent replacement. So why isn't that essentially a, you know, judicial admission that, in fact, he was hired before, he just wasn't hired as a foreman? There were discussions to hire him as a foreman prior to, prior to. I'm reading, I'm reading what the Board says is from the transcript of what the lawyer for the government's, for the company said at the hearing, footnote 20 of the Board's opinion. Is that wrong? Was that not said? My recollection of the testimony, again, I, I would have to go back to it. I'm not asking you about the testimony. No. I'm asking you about what the lawyer said at the hearing. And. To say, sure, he was hired before. He was hired in a different position, and he wasn't hired as a permanent replacement. I, I would have to go back and look at the counsel's. Similarly, the liaison here on the Respondents' Counsel was asked whether he was saying that Spire accepted an offer of employment and unaccepted it. Yes, that's what I, that's what the messages bear out, you said. Okay. I, I would have to defer to the, to that, because I, I don't have that right in front of me, Your Honor. Do you want to save some time for rebuttal? Yes, Your Honor, four minutes, or whatever is left is. Thank you, Your Honor. Thank you. Good morning. Good, good morning. I was just checking the clock, make sure it's still morning. I'm Barbara Sheehy. I represent the National Labor Relations Board. I'm going to start very quickly with Thrive, I think, in hopes that I can answer some questions. In fact, I think I can answer some that even came up in the argument before mine, because the March case that you, Judge Berzon, asked about, I handled that case. It's Macy's. It is fully briefed in that case, as my colleague said. And in addition to that, I think about two weeks ago, the panel in that case had ordered supplemental briefing on a specific issue on a Jarchezi, that the Jarchezi case. So does that mean we need to hold this case for that one, or, I mean, you, you argue that the issue was waived in this case, and, therefore, we could just say that? Absolutely. I understood from the prior argument, it sounded like you have internal court procedures on how things may be held, so I won't speak to that. But if the court finds that it's waived, then unless that contravenes your internal procedures, I think that, yes, you could dispose of it on that grounds. But if the court decides it's not waived, then you'd have to follow whatever internally your processes are. And their argument as to why it's not waived is that it would have been futile because the board was or had already routinely been denying any further challenges. I don't know that it's fair to characterize it as the board had been, I realize, the futility argument in the reply brief. I don't think it's a fair characterization to say that it was routinely denying these motions for reconsideration, and, in fact, the one that is cited in the reply brief is a case, the Starbucks case. That was after. That case was immediately after this one. So they're relying on a case. Sotomayor, I see. Starbucks came. It was Tracy Auto and then Starbucks. So to cite to another employer who likewise didn't or who raised the challenges, but they were denied, in hindsight, I think, is not an appropriate way to use the futility doctrine. Well, will they have another opportunity to challenge this at the time of the enforcement proceeding? The challenge, yes, but let me be very clear on what they can challenge. So when there's the compliance proceeding, if it goes, and I think my colleague outlined how that whole process works, so if there is actually a compliance specification that's issued and the employer thinks there is part of the make-whole relief that it's objecting, that it doesn't think is lawful or exceeds the board's authority or it's just it wasn't proven, they didn't show the direct causation, yes, they can challenge that before the board, and then if they're unhappy with that decision out of the board, it comes, it could come to this court or another court that would have jurisdiction over the proceeding. So the answer is yes, but I'm not sure about the — I don't think they could raise a facial challenge, for instance, in a compliance proceeding. So that's why I'm sort of hedging on my answer. I think the challenges in a compliance proceeding are going to be specific to the  Sotomayor, you say they couldn't challenge the Thrive rule later, even though Not in a compliance proceeding, no. In the compliance proceeding, it would be limited to the specifics of that case, an issue they had with the — where you would say, for instance, if there were credit card bills, you would argue, I don't think that you've shown the appropriate causation. But that's a very strange rule, because it could be that the Thrive issue never comes up. It doesn't matter. So why do they get to challenge it at a point when we don't know whether it matters, but they can challenge it at a point when we do know that it matters? I'm not sure I understand the question. They — if they — if they, in a motion for reconsideration, in this case, if they had brought the challenges, then those would be — they could do that. You could challenge Thrive on the basis that we've seen in their — I think it's both reply and — Even though we don't know if anybody in this case is going to ask for any relief on — I believe so. I don't believe the Board has taken the position in — because there are other cases where this is challenged, where it has been appropriately preserved. The Starbucks case, for instance, I think it was Starbucks, where there was a motion for reconsideration, there was the appropriate challenge at the appropriate time. And I don't believe the Board in court has been taking the position that no Thrive challenge is appropriate unless and until we've hit a compliance proceeding. I don't believe the Board — But it depends what the challenge is. I mean, I take it you agree — it seems there's agreement that whatever the Board can do, it can't do consequential damages. Is that true? I'll be honest. I've seen a lot of these briefs referring to consequential damages and compensatory damages. And I don't — I get confused getting down in the terms of art, because I don't know — But what it can do — You could call this whatever you wanted to call it, but the question is, is it appropriate under the Act? Is this part of the equitable make-whole relief? So I — Well, presumably what it couldn't do — I'm sorry? What it couldn't do pretty clearly is emotional distress damages. Or punitive damages, things like that. I don't — I don't — those I can get my head around. It's when you call things consequential or compensatory, when — All right, well, so let's just — I'm more just trying to set this up. So let's just say emotional distress damages, you know, if there's agreement on that. But nonetheless, if NLRB issues a decision today that says there may be emotional — we will allow emotional distress damages. Presumably somebody could challenge that, just like what they're trying to do here with Thrive. They don't have to wait until an enforcement order actually comes out. Right, because that would be a facial — that would be more like a facial challenge. This is — under no circumstances is this an appropriate remedy. Right, but that's what I understand them to be arguing here and in the prior case, too. Essentially a facial challenge. And so the issue is more just, is there any merit to that? Here, the argument, of course, is that it's waived. But I think it's sort of similar to the emotional distress hypo. It's just that there may be less — it's less stark and there may be less grounds for thinking that it's facially invalid. And I think our brief addresses that. So it would be a statutory claim. Principally, I read it as a statutory claim. That it exceeds the board's authority under 10C. That the board doesn't have the ability. And we respond to that in the brief. So whether it's waived or not, we have responded. I don't think the court needs to reach it. Yeah, I don't know why — to Judge Berzon's question about the follow-on enforcement proceedings. I'm not sure why somebody couldn't come into those and say, this form of relief is disallowed under the statute. And to the extent that Thrive permits this, then Thrive is wrong. I don't see why that would be prohibited. I think the board would take the position that if you had a broad challenge like that, it needed to come at the time the damage — sorry, the time of the relief was ordered, as opposed to the specific of the compliance proceedings. So I think the board would take the position — it hasn't happened, so I don't want to buy in the board — but logically, I think the board would take the position that by the time you've gotten to compliance, what we're fighting over is only the numbers now and the number of people and the amount of dollars to put people back where they should have been, not the actual relief itself. So let me see if I can clarify this. I think I have your position on this, but this is actually kind of really important. Because you're familiar with the board's — you know, the dissenters in the Thrive — the board's Thrive dissenters, right? And they said, yeah, a lot of the stuff that you're calling — that falls under your foreseeable, we've allowed. And they list a bunch of it. And they say, but there's some things we haven't, and we don't think we should. And that's what they were sort of dissenting about, right? That was the — and that was the division. And as I understand what you're saying to us today, is that if you were to try to take an argument and make an argument like that as a party, you need to raise it in this proceeding. You can't raise it in the later compensatory proceeding, because that would be like arguing that they just don't have statutory power for this type of damage, period. Not — and only — the only thing they can raise later is, no, this doesn't actually — these damages didn't actually result from, at all, that they're not foreseeable or something. Like, you can make that in your later proceeding. But your position is, or you think — you don't want to bind the board, but you think the board could take the position that they have to basically make their claim that the emotional — you know, these are emotional damages, and they're just not allowed because they're consequential, or these are — this is my telephone bill, or, you know, whatever type of — this is my — I had to take out a loan. Those type of damages, if they want to make — if they want to challenge it because those are just not allowed under your statutory power, they need to make it now. Well, I want to — here's how I want to answer the question, because I think your question is getting into very specific types of different ways that remedies would be ordered in a case. And here what the board did — so I'm reluctant to say you would need to tell the court now you have a problem with emotional damages, or you need to tell the court now, or the board, rather, and then the court in the merits proceeding, you need to say, no, you shouldn't be including emotional damages, or you shouldn't be including credit card damages. But let's remember what the board — those were examples in the case. Those were the examples in Thrive. But all — what Thrive did was standardize the Maykul remedy. What Thrive ordered — But I believe the dissent — the disagreement between the majority in the board decision wasn't just about the examples in that case. It was also talking about, well, I think that you're — I think that this rule that you're creating a majority maybe goes too far, because just because something is foreseeable, that's further than even proximate cause in the tort context and Seventh Amendment. And as I understand, you're saying if you want to make those kind of arguments, you need to make them now, or you can't make them later. And the challenge — what's driving, I think, some of the concern you've heard in this and the last case is that it all feels kind of abstract, the way the arguments are being made now. But it sounds to me like what you're saying is when this gets to be more concrete, it'll be too late to make the arguments. So that's the catch-22 that I'm feeling a little bit right now. It seems like there's almost a standing problem for purposes of this Court, because we don't know whether this is ever going to matter in this case. We don't know if they're going to be asked to pay anything that comes under Thrive. So how are we litigating it? I mean, it's still part of the board's order, where they've included in the Mekul the relief, the direct and foreseeable pecuniary harms. Well, if there is any. Certainly. Right. All right. I think you should go back to this case. What's the story with the 14 stalls and how many people can work in this facility? Right. That's a great question. And I wish that the record was clearer on this point, and I'd remind the Court that it was up to the employer to make the record clear on this, because this is their affirmative defense. We couldn't hire these two people back. And as Judge Van Dyke was pointing out, the administrative law judge on page 15, or it's part of the page 15 of the DNO, but it's part of the administrative law judge, runs through from January to July. The chart is there. Runs from January to July of 2020, identifying the number of active techs. So these are not including the people that are on disability leave. So how they were accommodating, for instance, in January, where circumstances were exactly the same. The lube center was closed. All they had was the service center. 18 active techs, 17, 17. So I don't know the answer to that. And I — my reading of the record, and we've pointed this out in the brief, is there was very limited testimony, much more limited than what's presented in the brief. This whole narrative about if this is like an apartment and this is exclusive to their use, you'll notice there are no record sites for that part of the brief, because there's not testimony in that regard. The testimony was that technicians were assigned a stall. The testimony was not, I was assigned a stall. And I was the only one who got to use it. There's not — I don't think the use of the word exclusive in — that might be a little bit too much. I don't — I don't look — I didn't read the record and find anything about anybody testifying that this stall is for my exclusive use. As for the toolboxes and how that also made everything difficult where you couldn't break it down or you couldn't move it, again, the only testimony on that, one employee testified that his toolbox was kind of big. And you'll notice what I thought was — what I think drove home our point the most is in the reply brief when they come back and try to respond to the board's answering brief, with respect, for instance, to the toolboxes, they cite to a D.C. Circuit case involving a different employer toolboxes to put forth the notion that these toolboxes are enormous. It's not in this record. And, again, it was up to the employer to put this evidence in. So I think it's a great question, what's going on with the 14 stalls and the number of technicians. And what isn't clear is how many people could be accommodated. And the board took the position, look, we're looking at your — they're not just the productivity reports. It's the staffing. We're looking at this. And you've had upwards of 18 people that doesn't fit with your narrative now. And there's no evidence that you can point to in the record. Do you want to address the — I mean, I think we've gone over Steyer and Lopez in great detail, but what about the Foreman question? First of all, your opponent thinks the Foreman question goes to the whole election and essentially to whether there really is a — I mean, I guess he's saying that the whole Laidlaw question is kind of up in the smoke, but you seem to think it goes only to the subpoena question, the Foreman. We do, and I'll explain this, and this is — I'd also like to apologize. The board — we should have included in our brief, I think, for just — for no other reason other than just to inform the court how the process works, we forgot to include how that — why this only applies in the — to the subpoena issue. So there were elections. There was the election.  The union won. There were objections filed. The Foreman voted. The Foreman voted, right. There were challenge — they voted under challenge, though, because there were challenge ballots. Right. And then there were objections filed, which is — this is standard procedure. The employer files the objections. The region handles the objections. The region — there were 20 of them. The region overruled 17 of them, so said there's no merit to your 17. Three of them got put over to hearing, which is why you have three objections in this case, two of them having to do with the supervisor — the Foreman's status as supervisors, and then the third one that doesn't matter, but it's in the case, the intimidating tactics, I think. So once these objections — only remaining three — once they were resolved through the board, through the ALJ, they say they're not supervisors, then the election stands, the certification issues, because there's no more impediment to the certification. And then, just as a footnote to all this, after that, if the employer wants to contest, they have to refuse to bargain, prompt the ULP, and then we go into court on that. So yes, we — No, it's unrelated to the questions that are before us, basically. Right. No, not at all. The 211 — the statutory supervisor issue relates only to the subpoena, to the subpoena issue. Absolutely, yes. And I don't know if you had other questions on that, but that's why. And it would have been clearer, like I said, if we put it in the brief. I do, in the sense that, obviously, as with the other questions, there are very different versions with regard to what the authority of the Foreman was. Right. There always are, right, in the statutory. You have generalized oftentimes in this case. I think it played out the same way I've seen it in other cases. You have very generalized testimony from the management witnesses, because they have the interest in making sure that these employees are statutory supervisors. And then you have the specific testimony from the witness, from the people who are actually doing the job themselves, and they are very specific on, no, we don't assign work, we don't reward employees. And so I don't think it's unusual to have two very different sets of testimony in statutory supervisor instances. And we look at substantial evidence. Right. Right.  There were just, I think, one or two things that I wanted to say. Oh, there was a question. Back to Spire. I'm sorry? So are we going back to Spire and Lopez, or is there something else you want to talk about? No, no, no. Go ahead. Oh, you have a question on Spire. Well, yes. He did not test. He didn't know when he had been offered a job. He didn't recall the date. He knew he was offered a job. He didn't recall the day of the interview. And I think part of that was explained by he interviewed several times. He interviewed in April, I think, for a service manager position, end of April. And then he interviewed again in May. And when he was on the witness stand and couldn't recall, they prompted his recollection through the board affidavit that he gave during the investigation of the unfair labor practice proceeding. And in that What is the evidence that shows that he accepted an offer on or around, I think it was about May 1st? So you've got the affidavit. Seemingly, there was almost like an admission by Toyota that he had been offered the job. Right. There's that. And I mean, I think that's pretty significant. And it wasn't just once. It was multiple times. It was also in filings. I think in their exceptions to the board, they say that he was a pre-strike hire. You've got the affidavit. You've got his related testimony. You've got the Toyota's own statements. Would there be anything else you would point to? With Spire, I don't think, I don't, I don't believe there was any, I can't, I don't believe there was anything else. I think there was his testimony. I mean, there was sort of this added testimony that he stopped looking for a job right after the interview, which I think is pretty compelling if you're unemployed and you Well, but he also said he hadn't really reached agreement about salary, but that then he did. But why isn't the whole thing over once the, when the employer has said several times that he was offered a job and accepted it, I gather. Is the problem that they thought it was a different job? Does that make a difference if it was a different job? In this case, in some cases it might. In this one, it doesn't make a difference. And it's because whether it was for the technician position or the foreman position, it was still a unit position. So if the focus is on what is the employee complement of the unit, as long as he was encumbering a unit position, it doesn't, for counting how many people were there before the strike, it doesn't matter what position he was, that he had committed to or that the employer had committed to give to him. I see. So if he had been offered a job in accounting, for example, this might be different. Absolutely. Absolutely. Assuming accounting. Yeah. They're not part of the unit. Yeah. For sure. Absolutely. Yeah. And then, let's see. I thought there was one other. Oh, as for the dates, there was just, I just wanted to clarify because I think it's in the brief, but it was raised again here by counsel here, that the board relied on sort of these dates that had been disavowed, or these dates, I think, on the documents, whether they were print dates or whatever. This has to do with Lopez. The board, again, on footnote 11, which is page 3 of the DNO, they disavow that. They do not rely on the fact that the administrative law judge refers to erroneous dates. So I just want to make that clear. I thought it was in our brief, but I just wanted to highlight that. In other words, the point is that dates weren't erroneous, but they were post hoc. I think what the issue was is the administrative law judge said something along the lines that the system is inherently incorrect, so any dates that issue on those documents, I'm not going to rely on those. And the board says, whoa, whoa, whoa, that's not exactly an accurate characterization of the testimony, so we're not going to rely on that. Finally, we'll look at the dates, though, on the documents. We'll take them on face value. But then the board said, even if this document is a May 18th drug consent form, which was after the May 15th strike and after Lopez accepted employment on May 13th, the board says, they looked at the testimony and they said, even if May 18th is the correct date, that's not inconsistent with Lopez being hired on the 13th. Miranda, who is the HR person, testified that it was not, while it was typical to execute documents on certain dates pre-hire, it wasn't mandatory, or it wasn't always, it didn't always happen. It wasn't impossible, I think is what he said. The board, when the board reviews the ALJ's decisions, it's not reviewing for substantial evidence, is it? No, I don't believe so, no. It's reporting, it's deciding for itself on the record. Yes, yes, yes. So, for example, when there was dissent with regard to Spire and Lopez, the dissenter wasn't reviewing the ALJ opinion for substantial evidence, but we are? No. That's right. No. The dissenting member took his own view of the evidence in mind with what the ALJ says, but the, at this point, though, the findings are by the board what particular, the weight of particular documents and testimony. But, no, Judge, Member Kaplan was able to look at the evidence in a different way than this Court does as the reviewing board member. I don't think I have anything else unless there's, I'm just looking over my notes and I don't think I have anything. My time's over anyway, so unless there are other questions, we'd ask for full enforcement. Okay. Thank you, Ms. Sheehy. Thank you. Mr. Boggs. Actually, Your Honor, I'm Mr. Wealock, but Mr. Boggs is the trial counsel and he actually was on the briefs. Yeah, he also appears on the day sheet, so. I apologize. I was the one who actually filled out the sheet for today, so I'm not sure why that happened. Well, I'm glad you're here. I'm glad I'm here, too, Your Honor. Just real quickly, on the Foreman question, this is an issue where it relates both to the subpoena, and with respect to the subpoena, it really puts the employer in a position where, if they're challenging the foreman status of whether the foreman is a supervisor or an employee, if they're challenging that 211 status, that it puts the board's decision, puts the employer in almost an impossible decision as to whether to subpoena records in the hearing related to that issue and risk having a ULP sustained against them post, you know, after everything's been decided that, you know, after the board makes a decision that, no, they weren't a two-oven supervisor, they were an employee. Well, a little bit, but, I mean, it doesn't just kind of subpoena, you know, if you think about subpoenaing somebody for their communications with the NLRB general counsel, right, that you may be running a risk that a court's going to find that you shouldn't have done that. But this is something that's being done within the context of a hearing where there's actually an administrative law judge who is adjudicating whether or not evidence comes in and what the scope of the testimony is, as opposed to, like, a civil subpoena where I could go out and subpoena an employee about, you know, whatever subjects and include things on there that aren't necessarily supervised by the court. It's, you know, given the... Well, there may be other reasons why you should be able to do the subpoena, but the reason you gave is only that he wasn't a foreman, that he was a foreman. That was the primary reason, yes. The only reason. And that was the reason that the subpoena was there was because the contention in the case, the litigated issue in the case, was whether they were foremen or not. Can we go back to Spyer for a minute, because I'm still very concerned about the fact that it appears that, is it not correct that the employer, Tracy Otto's lawyers, before the hearing and during the hearing and writing and orally agreed that there was, that he was offered and accepted a job? I believe that's true, Your Honor. Well, then why are we even here? I mean, what... It waives the issue. Well, I think, again, we're looking at the difference between being offered the position and actually being hired into the position. But I said offered and accepted. No. And I understand. And when you look at the difference between him and the other employee, Mr. Cabrera, that was admitted that he was an employee even though he hadn't actually started work, the paperwork, the new hire paperwork had been completed as to Mr. Cabrera. And that's why we really didn't have an objection to having him included on the laid-off list, you know, his position included on the laid-off list, because it was clear that he was an employer. Mr. Cabrera, we're talking about a supplier. I understand. And the evidence that's in the record is that even if he was offered prior to that time, the paperwork and any steps that were taken to actually formalize his employment didn't occur until after the strike. And so he... But that's not the standard. That's what the very first question I asked you. The very first question I asked you is that if he was offered and accepted a lay-off, is that what counts? And you said yes. And I... No, I understand. And I guess that's... I find that surprising, actually. I understand. That seems to be the rule. But I think, you know, I think that you look at the totality of the circumstances and it's... And the totality of the circumstances are that there's essentially a judicial estoppel problem here because you agree that he was offered and accepted a  I mean, I don't know what... I don't know exactly how to respond to that. Well, we've taken you over your time and I want to thank you very much for your presentation this morning. We thank Ms. Sheehy for her presentation. This matter is submitted. That concludes our calendar for today and the week. The Court would like to thank the staff of the Browning Courthouse for their excellent work during the sitting. And the Court is adjourned. Thank you. All rise.
judges: BERZON, BRESS, VANDYKE